UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------------X

GAMARD TALLEYRAND,

                                                 Plaintiff,

               -against-

ANTHONY J. ANNUCCI, individually and in his official
capacity as Acting Commissioner of the New York State
Department of Corrections and Community Supervision,
ADA PEREZ, individually and in her official capacity as
Superintendent of Downstate Correctional Facility, KATHY
TODD-SCOTT, individually and in her official capacity as
Sergeant, GEORGE SANTIAGO, individually and in his
official capacity as Correctional Officer, ADAM J. DIXSON,
individually and in his official capacity as Correctional Officer,
JASON G. WALKER, individually and in his official capacity
as Correctional Officer, JOSEPH O'TOOLE, individually
and in his official capacity as Correctional Officer, JENNIFER
MARTINS, individually and in her official capacity as
Correctional Officer, NICHOLAS FOLDVIK, individually and
in his official capacity as Correctional Officer, CHERYL
KELLY, individually and in her official capacity as Correctional
Officer, LOUIS PEGUERO, individually and in his official
capacity as Correctional Officer, "JOHN" REED, individually
and in his official capacity as Correctional Sergeant, PETER
SHANAGHER, individually and in his official capacity as
Correctional Sergeant, WILLIAM MANY, individually and in
his official capacity as Deputy Superintendent for Security of
Downstate Correctional Facility, JOSEPHINE HUDSON, R.N.,
individually and in her official capacity, PANDORA VOLPE,
R.N., individually and in her official capacity, SUSAN
LANGFORD, R.N., individually and in her official capacity,
and MARIO MALVAROSA, M.D., individually and in his
official capacity as Downstate Correctional Facility Health
Services Director,

                                       Defendants.
---------------------------------------------------------------------------X

16 Civ. 5468 (CS)

**VERIFIED AMENDED
COMPLAINT**

Jury Trial Demanded

         Plaintiff, GAMARD TALLEYRAND, by his attorneys, HELD & HINES, LLP, as and for

his Verified Amended Complaint, hereinafter alleges as follows upon information and belief:

## PRELIMINARY STATEMENT

1.      Plaintiff commences this action pursuant to 42 U.S.C. §1983 seeking compensatory and punitive damages against Defendants for violating his constitutional rights while acting under color of law, together with reasonable attorney's fees and costs pursuant to 42 U.S.C. §1988.

2.      On or about July 3, 2013, Plaintiff was received into the custody and care of the New York State Department of Corrections and Community Supervision ("DOCCS"). Plaintiff was a prisoner confined to DOCCS' custody and care at Downstate Correctional Facility ("DCF") from on or about July 3, 2013 through October 2013.

3.      On September 11, 2013, Plaintiff was brutally beaten in an unprovoked attack by Defendants, Correctional Officer George Santiago ("C.O. Santiago"), Correctional Officer Jason G. Walker ("C.O. Walker"), Correctional Officer Adam J. Dixson ("C.O. Dixson"), and Sergeant Kathy Todd-Scott ("Sgt. Scott") (collectively referred to as "the assaulting officers"), while all were acting under color of law. The assaulting officers were personally involved in this excessive use of force in that they either personally struck Plaintiff or witnessed the beating and failed to intervene despite having opportunity and reason to do so. During this excessive use of force, the assaulting officers punched and stomped Plaintiff in his face and head, and then while holding him down, twisted Plaintiff's lower right leg in an attempt to break his ankle, which they in fact did.

4.      Following this excessive use of force, the assaulting officers, as well as Defendants, Correctional Officer Joseph O'Toole ("C.O. O'Toole") and Correctional Officer Jennifer Martins ("C.O. Martins"), who, upon information and belief, arrived at the scene of the beating and witnessed Plaintiff's injuries, failed to notify medical personnel that Plaintiff was injured and/or request medical attention on his behalf. Instead, these defendants forced Plaintiff to walk to the infirmary on his fractured ankle and with a swollen, bleeding right eye.

5.     While at the infirmary, Defendants, Correctional Officer Nicholas Foldvik ("C.O. Foldvik"), Correctional Officer Cheryl Kelly ("C.O. Kelly"), Correctional Officer Louis Peguero ("C.O. Peguero"), Sergeant "John" Reed ("Sgt. Reed"), and Sergeant Peter Shanagher ("Sgt. Shanagher"), witnessed the severity of Plaintiff's injuries and physical condition and were deliberately indifferent to same. Said defendant(s) then insulted and taunted Plaintiff and threatened him with a knife, stating that he would cut Plaintiff's stomach open if anyone were to find out the truth of what had just happened.

6.     Additionally, Defendants, Josephine Hudson ("Nurse Hudson"), Pandora Volpe ("Nurse Volpe"), and Susan Langford ("Nurse Langford"), were deliberately indifferent to Plaintiff's objectively serious medical condition such that they denied him access to timely and appropriate medical care (e.g., x-rays, hospital transfer, physician examination, etc.).

7.     Following the incident, Defendants undertook specific efforts to cover-up the criminal wrongdoing of the assaulting officers by failing to truthfully document the nature and cause of Plaintiff's injuries. Defendants also attempted to silence Plaintiff from speaking the truth about what happened by threatening his life with a deadly weapon and failing to timely transfer him to a hospital where the full extent of his injuries and their cause would be reported. Further to their goal of preemptively discrediting Plaintiff for their own self-interest, the defendants drafted false medical records, false use of force statements and reports, and issued a false inmate misbehavior report in which defendant(s) falsely claimed that Plaintiff used profanity toward an officer and punched another officer, thereby giving the appearance that the assaulting officers used force in self-defense.

## JURISDICTION AND VENUE

8.     Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§1331 and 1343(a)(3)

and (4) and the aforesaid statutory and constitutional provisions.

9.      Plaintiff's claim for attorney's' fees and costs is predicated upon 42 U.S.C. §1988, which authorizes the award of attorney's fees and costs to prevailing plaintiffs in actions brought pursuant to 42 U.S.C. §1983.

10.     Venue is appropriate in this Court pursuant to 28 U.S.C. §1391(b)(2), as a substantial part of the events or omissions giving rise to this claim occurred within Dutchess County, New York, which is within this judicial district.

## THE PARTIES

11.     At all times alleged herein, Plaintiff was a prisoner confined to the custody and care of the State of New York and its Department of Corrections and Community Supervision ("DOCCS").

12.     At all times alleged herein, Defendant, Anthony J. Annucci, was and remains the Acting Commissioner of the New York State Department of Corrections and Community Supervision, having been appointed by Governor Andrew Cuomo. Commissioner Annucci was and remains the chief executive officer of DOCCS.

13.     As DOCCS Commissioner, Annucci is responsible for the

> superintendence, management and control of the correctional facilities in the department and of the inmates confined therein, and of all matters relating to the government, discipline, [and] policing…concerns thereof. He…[has] the power and it shall be his…duty to inquire into all matters connected with said correctional facilities. He…shall make such rules and regulations, not in conflict with the statutes of this state, for the government of the officers and other employees of the department assigned to said facilities, and in regard to the duties to be performed by them, and for the government and discipline of each correctional facility, as he…may deem proper, and shall cause such rules and regulations to be recorded by the superintendent of the facility, and a copy thereof to be furnished to each employee      assigned      to      the      facility…He…shall      appoint      and

> remove…subordinate officers and other employees of the department who are assigned to correctional facilities."[1]

Commissioner Annucci also has the duty and power to require reports from all DOCCS superintendents and employees, to inquire into any improper conduct alleged to have been committed by any person at any correctional facility,[2] to require psychological screening of all applicants, to bar and remove the appointment of any person to the position of correction officer or supervisor, to require the transfer of prisoners to outside hospitals for medical diagnoses and treatment,[3] to require a background investigation of all applicants, to require a thorough investigation to determine the character and fitness of all applicants, to require all new officers to participate in and satisfactorily complete all requirements of a traineeship program before advancing to Correction Officer, and to require all appointees to serve and satisfactorily complete a probationary period before advancing from Trainee to Correction Officer.

14. At all times alleged herein, Defendant, Ada Perez, was the Superintendent of Downstate Correctional Facility ("DCF"), having been appointed by the Commissioner of DOCCS. As Superintendent, Defendant Perez (or "Superintendent Perez") was directly responsible for the supervision and management of DCF[4], including but not limited to directing the work of all officers and subordinates at the facility, defining the duties of all officers and subordinates at the facility, recommending transfer of a prisoner for medical diagnosis and treatment at an outside hospital, enforcing general security policies, and authorizing and managing policies, procedures and customs governing day-to-day security. Additionally, Superintendent

---

[1] New York Correction Law §112(1).
[2] New York Correction Law §112(3).
[3] New York Correction Law §§5-8, 22-a, 23.
[4] New York Correction Law §18, 23.

Perez was responsible for the assignment and removal of staff, the training of staff, and the supervision of staff and prisoners to ensure a safe environment.

15.     At all times alleged herein, Sgt. Scott, Sgt. Reed and Sgt. Shanagher were employees of the State of New York and promoted to the rank of "sergeant" by the commissioner of DOCCS. As a higher-ranking officer, Sgts. Scott, Reed and Shanagher were responsible for the direct supervision of the defendant correction officers on said date; for supervising the custody, security, safety and well-being of Plaintiff and other prisoners at DCF; for supervising the movement and activities of Plaintiff and other prisoners at DCF; for making periodic rounds of assigned areas; for conducting searches for contraband; for maintaining order within the facility; for preparing reports as necessary; and for advising inmates on the rules and regulations governing the operation of the facility and assist them in resolving problems.

16.     At all times alleged herein, Defendants, C.O. Santiago, C.O Dixson, C.O. Walker, C.O. O'Toole, C.O. Martins, C.O. Foldvik, C.O. Kelly, and C.O. Peguero, were employees of the State of New York and employed as DOCCS correctional officers. On September 11, 2013, these defendants were under the direct supervision of Sgts. Scott, Reed and/or Shanagher. As correctional officers, said defendants were responsible for the custody, care and control of Plaintiff and other prisoners at DCF; for protecting the security, safety and well-being of Plaintiff and other prisoners at DCF; for supervising the movement and activities of Plaintiff and other prisoners at DCF; for making periodic rounds of assigned areas; for conducting searches for contraband; for maintaining order within the facility; for preparing reports as necessary; and for advising inmates on the rules and regulations governing the operation of the facility and assist them in resolving problems.

17.     At all times alleged herein, Defendants, Nurses Hudson, Volpe and Langford were licensed registered nurses with the State of New York and members of the medical staff assigned to the DCF clinic/infirmary on September 11, 2013. Said defendants were responsible for providing competent and thorough professional services in all aspects of Plaintiff's health care on September 11, 2013, including but not limited to taking an accurate patient history; performing physical examinations and recording results; ordering blood tests, X-rays and other tests to supplement the examination and assist in evaluating Plaintiff's signs, symptoms and problems; evaluating Plaintiff's condition and making a diagnosis; discussing findings with Plaintiff and making recommendations; administering treatment and prescribing medications and other treatments to treat Plaintiff's health problems; conducting follow-up examinations and tests to reassess Plaintiff's condition and revise treatment in response to findings; conducting sick call to further evaluate Plaintiff's condition; referring Plaintiff to medical specialists, hospitals, and other treatment providers; assigning, coordinating and supervising the treatment and care of Plaintiff by medical, nursing, patient care and other support staff; and approve the discharge and planning of Plaintiff following the subject use of force.

18.     At all times alleged herein, Defendant, Mario Malvarosa ("Dr. Malvarosa"), is a physician licensed to practice medicine in the State of New York and was the Health Services Director of Downstate Correctional Facility. As Health Services Director, Dr. Malvarosa was DCF's highest ranking medical authority and he reported directly to Superintendent Perez and indirectly to the regional medical director. Dr. Malvarosa was responsible for supervising the medical staff, all aspects of inmate health care, and scheduling medical coverage. Dr. Malvarosa was responsible for supervising the infirmary medical staff on September 11, 2013, including but not limited to Nurses Hudson, Volpe and Langford. Dr. Malvarosa was responsible for supervising

Plaintiff's health care and access to timely and appropriate medical treatment on September 11, 2013 and thereafter.

19.     At all times alleged herein, Defendant, William Many was the Deputy Superintendent for Security of DCF ("Dep. Many" and was responsible for the supervision of staff and prisoners to ensure a safe environment, including the enforcement of DOCCS rules and regulations. Dep. Many was also responsible for decisions concerning assignment of staff on September 11, 2013.

20.     At all times alleged herein, Defendants were entrusted with the custody and care of those persons imprisoned and confined to Downstate Correctional Facility, including but not limited to Plaintiff.

21.     At all times alleged herein, Defendants, individually and collectively, engaged in the alleged misconduct while acting under the color of law.

22.     At all times alleged herein, Defendants knowingly participated in, acquiesced to, contributed to, encouraged, authorized (either expressly or implicitly), approved, and/or were deliberately indifferent to the misconduct alleged.

## STATEMENT OF FACTS

23.     On or about July 3, 2013, Plaintiff was received into the custody, care and control of DOCCS at Downstate Correctional Facility ("DCF"). Plaintiff was considered to be a "reception prisoner" as he was scheduled to be drafted to another prison on September 12, 2013.

24.     On September 11, 2013, Plaintiff was housed in the mental health unit. The defendant officers were assigned to the mental health unit on said date.

25.     In the evening hours of September 11, 2013, Plaintiff was escorted by an unknown officer from his housing unit to an adjacent building in order to receive his medication. Upon

receiving his medication, Plaintiff was walking back to his cell when one of the defendant officers told Plaintiff to stop singing and be quiet. Plaintiff complied. Upon returning to his housing unit, Plaintiff was locked into his cell without incident.

26.     Approximately two minutes later, another officer unlocked Plaintiff's cell and informed him that he needed to return to the building where he just received his medication. Upon Plaintiff reaching a corridor thereat, the assaulting officers were there waiting for him. C.O. Santiago asked Plaintiff, "Who's a pussy?" and Plaintiff responded that he did not know what C.O. Santiago was talking about. C.O Santiago then abruptly punched Plaintiff in the face, sending Plaintiff to the ground.

27.     C.O. Dixson and C.O. Walker held Plaintiff to the ground, while C.O. Santiago continued to punch and stomp Plaintiff in the face and head. C.O. Dixson and C.O. Walker were also twisting Plaintiff's lower right leg at the time in an attempt to break his ankle, which they in fact did.

28.     Sgt. Scott was present for this gratuitous beating, but rather than intervene and order the assaulting officers to stop, she placed mechanical restraints on Plaintiff and allowed the beating to continue.

29.     During this wanton and excessive use of force, Plaintiff pleaded for the assaulting officers to stop; however, they continued to beat Plaintiff for approximately five (5) minutes.

30.     As a result of the subject beating, Plaintiff sustained significant and readily apparent injuries to his right ankle, right eye, face, shoulders, and thumb, along with other physical, emotional and psychological injuries.

31.     Following this unprovoked beating, Plaintiff noticed that Defendants Sgt. Scott and at least two other officers, upon information and belief C.O. O'Toole and C.O. Martins, and a

supervisor arrived at the scene. Upon information and belief, these defendants saw and/or heard the assaulting officers using excessive force upon Plaintiff but failed to intervene despite having reason and opportunity to do so.

32.     Despite seeing Plaintiff's bloody face and bleeding eye, and hearing Plaintiff's complaints that his right ankle was fractured and his shoulders injured, these defendants did not request medical assistance for Plaintiff. Instead, these defendants, together with the assaulting officers, maliciously forced Plaintiff to walk to the DCF infirmary on his fractured ankle and with a swollen, bleeding right eye. The walk from the subject location to the infirmary is extensive and meanders up and down numerous flights of stairs and through long corridors. This was done with reckless intent and deliberate indifference to Plaintiff so as to cause further injury, pain, suffering, and humiliation to Plaintiff.

33.     Despite Plaintiff's objectively serious medical condition, Nurse Hudson, and upon information and belief Nurses Volpe and Langford as well, failed to provide Plaintiff with any treatment whatsoever. As these nurses were the only medical personnel on duty at the DCF infirmary on the evening of September 11, 2013, they were Plaintiff's only hope for receiving the timely medical treatment necessary and required. Despite Plaintiff reporting extreme right ankle pain, said nurse(s) did not physically examine or provide any treatment to his ankle – no x-rays were taken, no pain medications were issued or prescribed, Plaintiff's ankle was not casted or splinted, and he was not transferred to a hospital. Despite Plaintiff having visible injuries to his face and head, including his right eye being bloody and swollen shut, said defendants did not physically examine or provide any treatment to those areas either.

34.     Plaintiff's injuries were obvious and of an objectively serious nature yet the defendant officers and medical staff refused to truthfully document the extent of his injuries.

35.     While at the infirmary, Defendant(s), C.O. Foldvik, C.O. Kelly, C.O. Peguero and/or Sgts. Reed and/or Shanagher, insulted and taunted Plaintiff about what had just happened to him and then threatened him with a knife, stating that they would cut Plaintiff's stomach open if anyone were to find out the truth of what happened.

36.     Upon being discharged from the infirmary, Plaintiff was maliciously forced to walk from the infirmary to the Special Housing Unit on his fractured ankle. The walk from the infirmary to the Special Housing Unit is extensive and meanders up and down numerous flights of stairs and through long corridors. As before, this was done with reckless intent and deliberate indifference to Plaintiff so as to cause further injury, pain, suffering, and humiliation to Plaintiff

37.     As described above, the defendants subjected Plaintiff to cruel, unusual, inhumane, and degrading treatment.

38.     As described above, the defendants consciously disregarded and were deliberately indifferent to Plaintiff's health, safety, and well-being.

39.     The following day, Plaintiff requested medical attention from an Intake officer. Later that day, Plaintiff was transferred to Putnam Hospital Center, where x-rays and CT scans were performed. Following same, Plaintiff was diagnosed with an avulsion fracture of his right ankle, right periorbital contusion with conjunctival hemorrhage and swelling making him unable to open his right eye, nasal bone fracture, closed head injury, forehead contusion, thumb contusion, and other physical injuries. Plaintiff's right ankle was splinted/casted at the hospital and he was discharged to DOCCS with instructions for follow up care.

40.     Upon returning to DCF, Plaintiff was admitted to its infirmary, where he remained for approximately six weeks recovering from the injuries inflicted by the assaulting officers.

41.     As described above, the defendants consciously disregarded and were deliberately indifferent to Plaintiff's objectively serious medical condition following the subject beating.

42.     At no time prior to using physical force upon Plaintiff did any of the assaulting officers issue any verbal command or warning to Plaintiff, threaten or administer oleoresin capsicum (O.C.) to Plaintiff, or use any other non-physical means of control on Plaintiff.

43.     Instead, the assaulting officers immediately began striking Plaintiff in the head without cause or justification and out of vengeance and malice.

44.     The assaulting officers subjected Plaintiff to unnecessary and wanton infliction of pain.

45.     The assaulting officers' conduct was grossly disproportionate to the severity of the circumstances then and there existing.

46.     The assaulting officers lacked any form of justifiable cause or reason to use physical force and/or inflict blows upon Plaintiff in order to maintain order as Plaintiff was not involved in a fight, posed no threat to the assaulting officers, and did not disregard a lawful order.

47.     The assaulting officers lacked any form of justifiable cause or reason to use physical force and/or inflict blows upon Plaintiff in order to enforce observance of discipline as Plaintiff was not involved in a fight, posed no threat to the assaulting officers, and did not disregard a lawful order.

48.     The assaulting officers lacked any form of justifiable cause or reason to use physical force and/or inflict blows upon Plaintiff in order to secure or control Plaintiff or the subject location as Plaintiff was not involved in a fight, posed no threat to the assaulting officers, and did not disregard a lawful order.

49.    At no point during the time period mentioned herein did Plaintiff neglect or refuse an order of a correction officer or violate a directive, rule or regulation of DOCCS.

50.    At no point during the time period mentioned herein did Plaintiff resist or disobey any lawful command of a correction officer.

51.    At no point during the time period mentioned herein did Plaintiff offer violence to any officer or prisoner.

52.    At no point during the time period mentioned herein did Plaintiff injure or attempt to injure DOCCS property.

53.    At no point during the time period mentioned herein did Plaintiff attempt to escape.

54.    At no point during the time period mentioned herein did Plaintiff attempt to lead or take part in a revolt or insurrection.

55.    Following the subject incident, and in attempt to cover up and/or conceal the unlawful conduct complained of herein, the defendants, acting individually and/or in concert and conspiracy with one another, all intentionally failed to report and/or misrepresented the events leading up to and during the subject incident, each party's' involvement in same, and the injuries and condition of Plaintiff as a result of the beating.

56.    Following the subject incident, and in an attempt to cover up and/or conceal the unlawful conduct complained of herein, the defendants, acting individually and/or in concert and conspiracy with one another, drafted, executed and filed knowingly false statements and reports wherein these defendants and their supervisors dishonestly stated that Plaintiff posed a danger to officers, others and/or the facility; that Plaintiff refused to obey a lawful order; that Plaintiff caused and/or threatened to cause serious physical injury to an officer or departmental property; and/or

these defendants and their supervisors made other knowingly false statements about the incident in official reports, to investigators, and in disciplinary proceedings commenced against Plaintiff.

57. As part of said conspiracy and cover-up, an Inmate Misbehavior Report was issued to Plaintiff. To justify the infraction, the assaulting officers falsely claimed that Plaintiff attacked C.O. Santiago and reasonable force was utilized to gain control of Plaintiff.

58. As part of said conspiracy and cover-up, the defendant(s) threatened to "cut [the Plaintiff] open if anyone finds out" what the assaulting defendants did.

59. As part of said conspiracy and cover-up, the defendants denied Plaintiff access to timely and appropriate medical care and treatment for his objectively serious and critical medical condition.

60. As part of said conspiracy and cover-up, the defendants failed to timely transfer Plaintiff to a hospital where the full extent of his injuries and their cause would be reported.

61. As a result of the assaulting officers' excessive use of force, Plaintiff suffered physical injuries of an objectively serious and important nature; however, the failures of the defendants to request, authorize, make arrangements and provide transportation for, and/or provide timely and adequate medical care and treatment to Plaintiff caused Plaintiff to maliciously and gratuitously suffer additional and prolonged pain and suffering and severely threatened Plaintiff's life.

62. Plaintiff's medical condition was of such gravity that it can be objectively considered a serious medical condition. Defendants, by ignoring his requests for treatment, acted with deliberate indifference. Defendants, by ignoring all available signs that Plaintiff was in physical distress, acted with deliberate indifference.

63. Defendants, Commissioner Annucci, Superintendent Perez, Dep. Many, and Dr. Malvarosa, as well as supervisory officers and the command structure of DOCCS, knew that the pattern of harassment, intimidation, physical abuse, cover-up, and denial of medical care, as described above, existed at Downstate Correctional Facility. These defendants were directly involved in failing to take measures to curb this pattern of brutality. These defendants, by failing to act upon this pattern of brutality, acquiesced in the known unlawful behavior of their correctional and medical staff. The prevalence of these practices and general knowledge of their existence, and the failure of these defendants to take remedial action despite the fact that the foregoing has been persistently brought to their attention, constitutes deliberate indifference to the rights and safety of all individuals in their custody, and Plaintiff in particular. These Defendants' conduct was a substantial factor in the continuation of such violence and proximate cause of the incident and injuries alleged herein.

64. DOCCS operates under a system-wide policy. With only some exceptions, DOCCS trains all of its correctional officers at a single Training Academy according to a uniform curriculum; maintains a centralized Investigation Division to investigate allegations such as those contained herein under uniform procedures; and maintains a centralized unit to conduct administrative prosecutions (or to decline to prosecute or to plea bargain) in those few instances where the DOCCS substantiates the allegation(s).

65. Defendants, Commissioner Annucci, Superintendent Perez, Dep. Many, and Dr. Malvarosa, as well as supervisory officers and the command structure of DOCCS have consistently failed to investigate allegations such as those contained herein and to discipline officers and medical staff who have violated DOCCS directives, guidelines, and/or the law. In the rare instance where an investigation does occur, these investigations are routinely clouded by a bias in favor of

correctional officers and medical staff and against prisoners. Furthermore, officers and medical staff who are known to have violated an individual's civil rights in one prison or command are often transferred by DOCCS to another prison or command rather than be disciplined, demoted, or terminated by DOCCS, thereby allowing the violence and other abuses to continue.

66.     As set forth above, the subject incidents, as well as the assaulting officers and medical staff on duty who ignored, acquiesced, joined and/or were complicit in same, constituted an unnecessary, unreasonable, and excessive use of force.

67.     On each occasion claimed herein, Defendants acted with deliberate indifference to the Plaintiff's safety, security, health, and immediate medical needs.

68.     As a direct and proximate result of Defendants' deliberate indifference to Plaintiff's objectively serious medical conditions, Plaintiff's resulting physical, psychological and emotional injuries, pain and suffering were gratuitously and maliciously exacerbated and his recovery compromised.

69.     As set forth above, Defendants have made every effort to conceal the truth above what actually occurred, including but not limited to covering up, or attempting to cover up, the illegal conduct complained of herein.

70.     The aforesaid acts and omissions violated the Plaintiff's clearly established civil rights secured by the United States Constitution and were the direct and proximate cause of the physical, psychological, and emotional injuries he suffered.

71.     Defendants' actions were malicious and served no legitimate penological interest.

## AS AND FOR PLAINTIFF'S FIRST CLAIM

42 U.S.C. §1983 Claim for Violation of Plaintiff's Constitutional Rights by Defendants
Sgt. Scott, C.O. Santiago, C.O. Dixson, C.O. Walker, C.O. O'Toole, C.O. Martins, C.O. Foldvik,
C.O. Kelly, C.O. Peguero, Sgt. Reed and Sgt. Shanagher

_____

72.     Plaintiff repeats and realleges each and every allegation set forth in paragraphs numbered "1" through "71" of this Complaint, inclusive, as though more fully set forth herein.

73.     As set forth above, the "assaulting officers, acting under color of law, did intimidate, assault, batter, and use excessive physical force on Plaintiff without legal cause or justification and with the purposeful and malicious intent to cause serious harm to Plaintiff.

74.     The assaulting officers used force on Plaintiff as punishment, and did retaliate against Plaintiff for exercising his First Amendment rights.

75.     As set forth above, the assaulting officers, acting under color of law, did deny Plaintiff access to timely, appropriate and necessary medical care, were deliberately indifferent to Plaintiff's objectively serious medical condition and needs following the subject beating, were deliberately indifferent to excessive risks to Plaintiff's health or safety, and did gratuitously force Plaintiff to walk from the location of the beating to the infirmary and then the SHU cell with a malicious intent to cause Plaintiff further pain and suffering.

76.     The assaulting officers did take specific and intentional action to cover-up their unlawful conduct, including but not limited to conspiring to create a false narrative of what transpired, knowingly drafting and filing false official reports, giving false sworn testimony to superiors, investigators and prosecutors, failing to report the incident to local, state and/or federal authorities, destroying physical evidence, preventing Plaintiff from receiving timely and necessary medical care and treatment, and preventing others from truthfully documenting and/or photographing Plaintiff's injuries.

77.     As set forth above, the assaulting officers, C.O. O'Toole, and C.O. Martins, did witness the excessive use of force and did fail to intervene to protect Plaintiff from same.

78.     As set forth above, Defendant(s) C.O. Foldvik, C.O. Kelly, C.O. Peguero, Sgt. Reed and/or Sgt. Shanagher, acting under color of law, did intimidate, assault, and threaten to inflict deadly physical force upon Plaintiff in the event he should truthfully report the criminal and gratuitous misconduct of the assaulting officers.

79.     As set forth above, the assaulting officers, C.O. O'Toole and C.O. Martins, acting under color of law, did deny Plaintiff access to timely, appropriate and necessary medical care, were deliberately indifferent to Plaintiff's objectively serious medical condition and needs following the subject beating, were deliberately indifferent to excessive risks to Plaintiff's health or safety, and did gratuitously force Plaintiff to walk from the location of the beating to the infirmary and then the SHU cell with a malicious intent to cause Plaintiff further pain and suffering.

80.     As set forth above, the defendants, acting under color of law, did take specific and intentional action to cover-up their unlawful conduct, including but not limited to conspiring to create a false narrative of what transpired, knowingly drafting and filing false official reports, giving false sworn testimony to superiors, investigators and prosecutors, failing to report the incident to local, state and/or federal authorities, destroying physical evidence, preventing Plaintiff from receiving timely and necessary medical care and treatment, and preventing others from truthfully documenting and/or photographing Plaintiff's injuries.

81.     The aforesaid misconduct was part of a widespread practice at DCF that, although not expressly authorized, constituted a custom or usage of which these officers' superiors were aware. The conduct of these officers in the instance were so grossly incompetent, inadequate, and

excessive so as to shock the conscience, and was intolerable to fundamental fairness, and was maliciously and sadistically used to cause further harm to Plaintiff.

82. These officers were part of an entrenched culture of violence and deliberate indifference to inmate safety medical needs by officers and healthcare workers, of which their immediate supervisors as well as DCF and DOCCS administrators were aware, including but not limited to Defendants, Commissioner Annucci, Superintendent Perez and Dep. Many.

83. These defendants have been involved in similar incidents prior to September 11, 2013, for which no corrective action had been taken against them, including but not limited to the incidents described below.

84. As a result of the foregoing, said defendants deprived Plaintiff of his rights secured by the Constitution of the United States of America and has damaged him thereby.


## AS AND FOR PLAINTIFF'S SECOND CLAIM
42 U.S.C. §1983 Claim for Violation of Plaintiff's Constitutional Rights by Nurse Hudson, Nurse Volpe, Nurse Langford, and Dr. Malvarosa
_____

85. Plaintiff repeats and realleges each and every allegation set forth in paragraphs numbered "1" through "84" of this Complaint, inclusive, as though more fully set forth herein.

86. As set forth above, Nurses Hudson, Volpe and Langford, acting under color of law, were deliberately indifferent to Plaintiff's objectively serious medical condition following the beating in that upon Plaintiff being presented to them they failed to faithfully examine and treat Plaintiff's visible and apparent injuries upon his presentation to the infirmary; only gave, if any, a cursory, superficial and fleeting visual check of Plaintiff when he was brought into the infirmary before approving him as fit for transfer to SHU; failed and/or refused to examine Plaintiff in his SHU cell; was criminally reckless in the instance; and otherwise failed to act in the instance despite

being actually aware of a substantial risk that serious harm will come of Plaintiff due to their failure to act.

87.    By virtue of their licensing and training, these defendants were consciously aware of the serious nature of Plaintiff's injuries and did ignore, refuse, deny and/or delay Plaintiff's requests for medical care and treatment; were complicit in and/or direct participants in the cover-up of the subject beating; did knowingly draft and file false medical and injury reports and/or gave false sworn statements in an effort to cover-up evidence of the assaulting defendants' excessive use of force and other misconduct; did fail to report what they saw and heard to local, state and/or federal authorities; destroyed physical evidence; prevented Plaintiff from receiving timely and necessary medical care and treatment; prevented others from truthfully documenting and/or photographing Plaintiff's injuries; and were otherwise deliberately indifferent as set forth above.

88.    The aforesaid misconduct was part of a widespread practice at DCF that, although not expressly authorized, constituted a custom or usage of which Defendant's superiors were aware.

89.    The conduct of Nurses Hudson, Volpe and Langford in the instance were so grossly incompetent, inadequate, and excessive so as to shock the conscience, and were so intolerable to fundamental fairness, and were maliciously and sadistically used to cause further harm to Plaintiff.

90.    Nurses Hudson, Volpe and Langford were part of an entrenched culture of violence and deliberate indifference to medical needs by officers and healthcare workers towards prisoners, of which their immediate supervisors as well as DCF and DOCCS administrators were aware, including but not limited to Defendants, Commissioner Annucci, Superintendent Perez, Dep. Many and Dr. Malvarosa.

91.     Nurses Hudson, Volpe and Langford have been involved in similar incidents prior to September 11, 2013, for which no corrective action had been taken against them.

92.     As a result of the foregoing, said defendant deprived Plaintiff of his rights secured by the Constitution of the United States of America and has damaged him thereby.

### AS AND FOR PLAINTIFF'S THIRD CLAIM
42 U.S.C. §1983 Claim for Violation of Plaintiff's Constitutional Rights by
Commissioner Annucci, Superintendent Perez, Dep. Many, and Dr. Malvarosa
_____

93.     Plaintiff repeats and realleges each and every allegation set forth in paragraphs numbered "1" through "92" of this Complaint, inclusive, as though more fully set forth herein.

94.     Commissioner Annucci, Superintendent Perez, Dep. Many, and Dr. Malvarosa are senior officials endowed and bestowed by DOCCS with policy-making and decision-making authority.

95.     These defendants allowed unconstitutional policies, customs and practices to occur at DCF and/or allowed the continuance of such policies, customs and practices, including but not limited to excessive uses of force by staff, cover-ups of staff misconduct, submissions of false and/or misleading official reports by staff, denial and delays of medical care and treatment to prisoners, perfunctory medical examinations of injured prisoners, destruction of physical evidence, and grossly inadequate training, supervision, retention and counseling of correctional officers and medical staff.

96.     The defendant officers and healthcare workers were part of an entrenched culture of violence and deliberate indifference towards the safety and medical needs of prisoners, of which Commissioner Annucci, Superintendent Perez, Dep. Many, and Dr. Malvarosa, and other supervisors and administrators, were aware.

97.     Upon information and belief, the defendant officers and healthcare workers have all been involved in similar excessive use of force and/or denial of medical care incidents prior to September 11, 2013, for which no corrective action had been taken against them.

98.     In fact, on or about September 10, 2013, the day before he beat Plaintiff, C.O. Santiago, along with Sgt. Scott and other officers, beat a shackled prisoner named Archie Singletary so badly that he sustained a fractured cheekbone and bruising all over his body. Similar to their "care" of Plaintiff after beating him, Mr. Singletary was dragged to the infirmary and cleared for transfer to SHU. While at SHU, Mr. Singletary complained of difficulty breathing; however, that only prompted the officers to beat him again as they took him back to the infirmary. No disciplinary action was taken against these officers. Mr. Singletary filed a federal action against these officers.

99.     A month prior to beating Mr. Singletary, on or about August 6, 2013, Sgt. Scott, C.O. Santiago and other officers beat a prisoner named Keenan Parker, during which C.O. Santiago purposely jerked and twisted Mr. Parker's left foot with the intent to fracture his ankle, which he did. As in this instance, Sgt. Scott watched idly as C.O. Santiago and other officers beat Mr. Parker. Sgt. Scott and C.O. Santiago then attempted to cover-up this beating by failing to follow DOCCS directives and procedures following uses of force, including but not limited to videotaping all escorts of prisoners to the infirmary and photographing injuries. Following this beating, Mr. Parker was taken to the infirmary, where medical and correctional staff thereat refused to document or examine Mr. Parker's injuries. The medical staff, Defendants herein, were deliberately indifferent to Mr. Parker's serious medical condition in that they failed to examine Mr. Parker's fractured ankle/foot or refer him to a hospital for care, failed to stitch his open wounds, and failed to provide pain medication.

100.    Despite these prior incidents involving the same officers, together with prior reports and recommendations issued both internally and externally, including but not limited to a 2009 report by the Correctional Association of New York ("CANY"), these defendants persistently failed to adopt any policy or practice, or modify any policy or practice (or the enforcement thereof), or faithfully investigate the circumstances in which a prisoner suffered a serious or questionable injury, with the goal to mitigate, eliminate and deter excessive uses of force by officers on prisoners and denial of medical care by correctional staff and infirmary personnel.[5]

101.    These defendants also failed to adopt any policy or practice, or modify any policy or practice (or the enforcement thereof), or faithfully investigate the reason DCF's work cadre prisoners are treated substantially better than its reception prisoners[6], despite CANY's 2009 report identifying key differences between these two types of inmates when it comes to staff relations (e.g. physical abuse, verbal harassment, false disciplinary tickets, retaliation for complaints/grievances, threats, intimidation, etc.) and provision of medical care and CANY's recommendation that this be evaluated. To wit, CANY's 2009 report found that (a) only 4% of work cadre prisoners reported experiencing a physical confrontation with DCF staff, compared to 21% of reception prisoners[7]; (b) 21% of work cadre prisoners reported feeling unsafe at DCF, compared to 41% of reception inmates; (c) 54% of work cadre inmates reported experiencing verbal harassment from staff "frequently," compared to 79% of reception inmates; and (d) 9% of work cadre prisoners reported that staff had shut off the lights or water in their cells as a form of harassment, compared to 27% of reception inmates.

---

[5] 80% of the work cadre prisoners and 61% of the reception prisoners surveyed by CANY said the administration at DCF "does very little or nothing to prevent abuse…"

[6] Plaintiff was a reception/transit inmate.

[7] Incredibly, 11% of reception prisoners surveyed reported having a physical confrontation with another inmate at least once at DCF; however, nearly twice that amount (21%) reported having a physical confrontation with staff.

102.    CANY's 2009 report also found that most physical confrontations between staff and inmates occurred during the 3:00 p.m. to 11:00 p.m. shift, with 56% of cadre inmates reporting that physical confrontations most often occurred in the reception draft processing area. With this information, these defendants could easily have (a) determined which officers were assigned to the reception draft processing area during the 3:00 to 11:00 p.m. shift, cross-referenced those names with prisoner claims of excessive force and lawsuits, and then initiated an investigation into said officers and staffing problems, (b) thoroughly scrutinized these officers' use of force reports, (c) thoroughly scrutinized prisoners' complaints about these officers, (d) thoroughly scrutinized reception prisoners' injuries and/or injured prisoners arriving to the infirmary from the reception area between 3:00 p.m. and 11:00 p.m., (e) restructured officer post assignments, work details, and office groupings so the officers involved in the highest incidence of uses of force will not be assigned the same tour, and (f) installed video cameras in the subject location to deter violence. However, these defendants did none of these things.

103.    Additionally, CANY's 2009 report found DCF's infirmary to be operating substantially below capacity, having a capacity to accommodate 14 inmates yet the average daily infirmary population was between 8-10 inmates. Despite operating below capacity, DCF reception inmates experience far more delays than cadre inmates when it comes to receiving care from the doctors, physician assistants and nurse practitioners in the infirmary, with their median wait time being 11 days compared to cadre inmates waiting one day. CANY's 2009 report stated "…there is no apparent reason that there should be such a difference in wait time for reception inmates." In addition to these delays, inmates also reported "perfunctory examinations and that the quality of encounters varied depending on the clinician."

104.    Further demonstrating these defendants creating and/or allowing an institutional

policy or practice of disparate, heavy-handed treatment of reception/transit inmates compared to work cadre inmates is the amount of grievances filed by each type of prisoner. CANY's 2009 report cites 54 grievances filed by DCF's work cadre inmates in 2009, a decrease from 57 in 2008, with the most highly grieved issues concerning medical services (11) and staff conduct (9). In contrast, DCF's reception inmates filed 478 grievances in 2009, an increase from 459 in 2008, with staff conduct (72 grievances) comprising 15% of all reception inmate grievances filed that year and medical services (49 grievances) comprising more than 10% of reception inmate grievances filed that year.

105.   With regard to DCF's Special Housing Unit, where Plaintiff was taken after the infirmary, CANY's 2009 report found that "[p]hysical assault, verbal and racial harassment, and threats and intimidation [by staff] were common forms of abuse reported by SHU survey respondents."

106.   In concluding its report, CANY made the following non-exhaustive list of recommendations:

- Examine the successful sick-call and medical call-out procedures for cadre inmates and devise similar procedures for the reception population.

- Ensure that all inmates scheduled for a clinic call-out are promptly seen in accordance with their medical needs.

- Enhance the medical screening process to make sure that detailed medical histories are obtained on all inmates, including asking if they have any chronic medical conditions or any need for immediate medical or mental health care, and to discuss all medical test results with inmates.

- Assess the level and causes of tension between staff and inmates within the reception area and develop a plan to reduce tension and incidents of verbal harassment, including diversity training for staff and inmates.

- Meet with the ILC (Inmate Liaison Committee) and IGRC (Inmate Grievance Resolution Committee) to discuss ways to reduce tension in the reception area.

107. Despite CANY's 2009 report and recommendations, these defendants failed to develop policies and practices adequate to deter officer on prisoner violence; failed to cure the systemic disparity of care between work cadre inmates and reception/transit inmates; failed to faithfully investigate officers with a history of grievances made against them for excessive uses of force and take corrective action; failed to faithfully investigate medical personnel with a history of grievances made against them for excessive uses of force and take corrective action; failed to reorganize certain officers' schedules so they could not work the same shift and location together; failed to develop policies and practices adequate to train, supervise, retain and counsel correctional officers in how and when to use force appropriately, the quantum of force to be applied, truthful and complete reporting of all incidents, making medical care available to prisoners, and peacefully interacting with and gaining compliance from prisoners; failed to develop policies and practices adequate to train, supervise, retain and counsel medical personnel in the truthful and complete reporting of all incidents, making medical care available to prisoners, and peacefully interacting with and gaining compliance from prisoners; continued to accept medical reports and unusual incident reports that they knew or should have known contained false, incomplete and/or misleading statements and conclusions by staff and supervisory personnel in an effort to cover up evidence of their subordinate's unlawful activities; failed to implement recommendations of training, re-training, suspension, and/or termination of employment where appropriate; and were otherwise deliberately indifferent to the safety, security and health of inmates confined to DCF.

108. The totality of similar incidents at DCF during the tenure of these defendants and their predecessors indicates that, given their supervisory duties and security responsibilities, these defendants were grossly negligent in their training, supervision, and retention of DCF's officers and medical personnel, including but not limited to the individuals involved in the subject incident;

in failing to act upon information indicating that unconstitutional acts were occurring; in failing and/or refusing to investigate staff on prisoner abuse at DCF and the officers and medical personnel involved; and in failing to adopt policies and procedures that would have prevented the abuses alleged herein.

109.  These defendants failed to perform their statutory and/or stated responsibilities in that they knew or should have known that the pattern of abuse set forth herein existed at DCF and its infirmary clinic. Their failure to take measures to curb this pattern of brutality, cover-up, and denial of medical care constitutes acquiescence in the known unlawful behavior of their subordinates. The prevalence of these practices and general knowledge of their existence, and the failure of these defendants to take remedial action despite the fact it has been persistently brought to their attention, constitutes deliberate indifference to the rights and safety of the prisoners in their care and custody, including the plaintiff. These defendants' refusal and/or failure to act and/or acquiescence to the misconduct alleged herein has been a substantial factor in the constitutional violations suffered by Plaintiff.

110.  Additionally, in an attempt to cover-up the misconduct of their subordinate staff, these defendants failed to notify local, State, and/or Federal authorities as required by law.

111.  As set forth herein, these defendants and their predecessors and subordinates have had, and continue to have, a custom and practice of deliberate delay and avoidance in investigating allegations of abuse and other misconduct by their officers and medical personnel, to the direct detriment of Plaintiff.

112.  Prior to September 11, 2013, these defendants and their predecessors developed and maintained customs, policies, usages, practices, procedures, and rules that resulted in (a) the deprivation of Plaintiff's Eighth Amendment rights; (b) uses of force in an unreasonable,

unnecessary, unjustified, excessive, retaliatory, and punitive manner; (c) inadequate instruction and supervision of officers and healthcare workers, and their supervisors, in the proper and appropriate care and treatment of prisoners in their custody and control; (d) inadequate instruction and supervision of officers and healthcare workers, and their supervisors, in communicating with, understanding, and gaining compliance from prisoners; (e) inadequate training, re-training, and supervision of staff in the use of force, avoidance of force, truthful reporting of incidents, duty to protect and intervene, and drafting and maintaining complete and truthful use-of-force, injury, and medical reports; (f) inadequate investigation into prisoner grievances/complaints of staff harassment, intimidation, misconduct, excessive use of force, abuse, discrimination, denial and/or delay of medical care, and other misconduct, and in the inadequate punishment of the subjects of those complaints that were substantiated; (g) tolerating acts of brutality and indifference; (h) tolerating acts of retaliation against a prisoner making a complaint against staff; (i) covering-up and/or insulating staff who engage in criminal or other serious official misconduct from detection, prosecution, and/or punishment; and (j) tolerating staff who engage in a pattern and practice of actively and passively covering up misconduct by fellow officers and medical personnel, thereby establishing and perpetuating a "code of silence."

113. The failures of these defendants to take any action to curb the abuses of their subordinate personnel, despite having received extensive information concerning the pattern of incidents involving violence and denial of medical care by the assaulting officers, medical care defendants, and other correctional officers and medical personnel on duty, was the moving force behind the constitutional violations suffered by Plaintiff.

114. These defendants not only overlook the type of oppressive, forceful acts alleged herein, but implicitly encourage it as a prisoner management tool. These defendants have a longstanding history of tolerating and authorizing the type of abusive practices alleged herein.

134. Through promotions and other financial and status incentives, these defendants have the power to reward officers and healthcare workers who perform their jobs adequately and to punish – or at the very least fail to reward – those who do not. These defendants' repeated failures to punish staff and supervisors who violate prisoners' constitutional and/or statutory rights have created and maintained the perception amongst staff and supervisors that harassment, intimidation, excessive use of force, discriminatory conduct, cover-up, medical neglect, and/or such other misconduct will not lead to investigation, punishment or detriment to one's career or even financial penalty. This pattern of unchecked abuse, and the breadth with which these unlawful practices have been adopted by significant numbers of staff and supervisors, and the persistent failure or refusal of these defendants to train, re-train and supervise these persons properly, demonstrates a policy of deliberate indifference towards the misconduct claimed by Plaintiff and was the moving force behind the constitutional violations suffered by the plaintiff.

135. As a result of the foregoing, said defendants deprived Plaintiff of his rights secured by the Constitution of the United States of America and has damaged him thereby.

**AS AND FOR HIS FOURTH CLAIM**
**42 U.S.C. §1983**
Conspiracy to Cover-Up the Subject Incident by All Defendants
_____

136. Plaintiff repeats and realleges each and every allegation set forth in paragraphs numbered "1" through "135" of this Complaint, inclusive, as though more fully set forth herein.

137. As set forth above, the defendants, all acting under the color of law, willfully conspired with one another to deprive Plaintiff of his constitutional rights, including but not limited

to his right to be free from cruel and unusual punishment; to be free from the use of unreasonable and/or excessive force; to be free from unreasonable delay and/or denial of medical care; to be free from harassment and intimidation; to be free from reprisal for exercising his First Amendment rights; to be free from malicious and retaliatory attacks; to be free from conduct intended to chill his speech; to be free from false and subversive statements and proceedings designed to cover up the misconduct of others; to equal protection of the law; to equal privilege and immunities under the law; to associate and speak freely; and to have access to and seek redress in the courts.

138.    In complicity with said conspiracy, each defendant, acting in their own self-interest to avoid criminal prosecution, civil liability and/or employment-related disciplinary proceedings, did submit a false report and/or statement to support and corroborate the fabricated allegations lodged against Plaintiff, or was aware that a subordinate or peer submitted a false report and/or statement and failed to report same.

139.    As a result of said conspiracy and/or the defendants' furtherance of the conspiracy, Plaintiff has been injured and deprived of the rights and privileges afforded by the Constitution of the United States of America.

140.    Defendants had knowledge that a 42 U.S.C. §1983 conspiracy was in progress, had the power to prevent or aid in preventing the conspiracy from continuing, and neglected or refused to do so.

141.    With due diligence, the defendants could have promptly reported the subject events to superiors and to duly authorized investigators. Their failure to do so allowed the conspiracy to continue, evidence to be destroyed, and the truth suppressed.

142.    Had said defendants complied with the law and furnished truthful information to authorities about their conduct and/or Plaintiff's conduct, the conspiracy would not have succeeded to the extent that it did.

143.    As a result of the foregoing, said defendants deprived Plaintiff of his rights secured by the Constitution of the United States of America and has damaged him thereby.

### RELIEF

Plaintiff requests compensatory damages against all defendants in an amount to be determined at trial, punitive damages against all defendants in an amount to be determined at trial, reasonable attorney's fees, costs and disbursements pursuant to law, and such other and further relief as this Court deems just and proper.

Dated: Brooklyn, New York
        September 11, 2016

Yours, etc.,

**HELD & HINES, L.L.P.**


_____/s/_____
By: Philip M. Hines, Esq.
*Attorneys for Plaintiff*
2004 Ralph Avenue
Brooklyn, New York 11234
(718) 531-9700
phines@heldhines.com

## ATTORNEY VERIFICATION

PHILIP M. HINES, an attorney duly licensed to practice in the courts of the State of New York, hereby affirms the following under penalties of perjury:

That I am a member of the law firm of HELD & HINES, LLP, attorneys for the plaintiff, Gamard Talleyrand, in the within action. I have read the foregoing Verified Amended Complaint and know the contents thereof; that same is true to my own knowledge, except as to the matters therein alleged to be on information and belief, and as to those matters, I believe them to be true. The reason this Verification is made by me and not by the plaintiff is that Plaintiff resides outside of the County in which the Affirmant's office is located.

The grounds of my belief as to all matters stated upon my own knowledge are as follows: the records, reports, and documents contained in the plaintiff's file.

_____/s/_____
PHILIP M. HINES, ESQ.

Affirmed to this 11th
day of September, 2016

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------------X

GAMARD TALLEYRAND,

                                                16 Civ. 5468 (CS)

                              Plaintiff,

       -against-

ANTHONY J. ANNUCCI, et al.,

                              Defendants.

---------------------------------------------------------------------------X


## VERIFIED AMENDED COMPLAINT


HELD & HINES, LLP
*Attorneys for Plaintiff*
Office & Post Office Address
2004 Ralph Avenue
Brooklyn, New York 11234
(718) 531-9700



Signature (Rule 130-1.1-a)


_____/s/_____
PHILIP M. HINES, ESQ.